Slip Op. 14-113

UNITED STATES COURT OF INTERNATIONAL TRADE

RUBBERMAID COMMERCIAL PRODUCTS LLC, :

                    *Plaintiff,*          :

           v.                 :       Court No. 11-00463

UNITED STATES,            :

                    *Defendant.*       :

[Granting Motion for Judgment on the Agency Record and remanding scope determination to agency]

Dated:  September 23, 2014

       Alexander H. Schaefer, Crowell & Moring LLP, of Washington, D.C., argued for Plaintiff. With him on the brief were Daniel J. Cannistra, Crowell & Moring LLP, and R. Kevin Williams and Jessica R. Rifkin, Clark Hill PLC, of Chicago, Illinois.

       Tara K. Hogan, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant.  With her on the brief were Stuart F. Delery, Assistant Attorney General, and Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch.  Of counsel on the brief was Joanna Theiss, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

## OPINION

RIDGWAY, Judge:

       In this action, Plaintiff Rubbermaid Commercial Products LLC ("Rubbermaid") – a U.S. importer of certain cleaning system components – contests the determination of the U.S. Department of Commerce ("Commerce") that Rubbermaid's products are within the scope of the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China ("PRC").  *See* Antidumping (AD) and Countervailing Duty (CVD) Orders on Aluminum Extrusions

from the People's Republic of China (PRC): Final Scope Ruling on Certain Cleaning System

Components (Oct. 25, 2011) (IA Doc. No. 4) ("Final Scope Ruling").[1]

Pending before the Court is Plaintiff's Motion for Judgment on the Agency Record, in which

Rubbermaid argues that the merchandise at issue should be excluded from the coverage of the

antidumping and countervailing duty orders ("the Orders") based on language defining the scope

of the Orders to exclude "finished merchandise" and "finished goods kits."  Rubbermaid contends

that this matter should be remanded to Commerce with instructions to make a determination that the

merchandise is excluded from the scope of the Orders.  *See generally* Memorandum of Law in

Support of Plaintiff's Motion for Judgment on the Agency Record ("Pl.'s Brief"); Plaintiff's Reply

to Defendant's Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Pl.'s Reply

Brief").

The Government opposes Rubbermaid's motion and maintains that Commerce's Final Scope

Ruling is supported by substantial evidence and is otherwise in accordance with law, and thus should

be sustained.  *See generally* Defendant's Opposition to Plaintiff's Motion for Judgment Upon the

---

[1]For ease of reference, citations to the administrative record are to documents filed under the antidumping case number (A-570-967), although the documents filed in the countervailing duty case are identically numbered.  During the course of this proceeding, Commerce began using an electronic filing system known as IA ACCESS.  Certain documents filed through IA ACCESS were submitted to the court under a separate index which was generated by IA ACCESS instead of Commerce's Central Records Unit (CRU).  The indices of the documents provided by each of the two filing systems are not numbered sequentially within the administrative record.  Thus, the administrative record is divided into two sections, with one designated as "CRU Doc. No. ___" for documents from the CRU index, and the other designated as "IA Doc. No. ___" for documents from the IA ACCESS index.  The administrative record for this scope proceeding consists entirely of public information.

Agency Record ("Def.'s Brief").[2]

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[3]  For the reasons summarized below, Rubbermaid's Motion for Judgment on the Agency Record must be granted, and Commerce's Final Scope Ruling must be remanded for reconsideration.

## I.  <u>Background</u>

In May 2011, Commerce published antidumping and countervailing duty orders on aluminum extrusions from the PRC.  *See* Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order, 76 Fed. Reg. 30,650 (May 26, 2011) ("Antidumping Duty Order"); Aluminum Extrusions From the People's Republic of China: Countervailing Duty Order, 76 Fed. Reg. 30,653 (May 26, 2011) ("Countervailing Duty Order").  The Orders define the covered merchandise, in relevant part:

> Subject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, window frames, door frames, solar panels, curtain walls, or furniture. Such parts that otherwise meet the definition of aluminum extrusions are included in the scope.  The scope includes the aluminum extrusion components that are attached (*e.g.*, by welding or fasteners) to form subassemblies, *i.e.*, partially assembled merchandise unless imported as part of [a] finished goods "kit" . . . .  The scope does not include the non-aluminum extrusion components of subassemblies or subject kits.

---

[2]The Aluminum Extrusions Fair Trade Committee – petitioners in the underlying administrative proceedings – submitted comments to Commerce concerning Rubbermaid's request for a scope ruling, and initially intervened as a defendant-intervenor in this action, representing the interests of domestic producers of subject merchandise.  However, the Committee subsequently withdrew from the litigation.

[3]All citations to federal statutes are to the 2006 edition of the United States Code.  Similarly, all citations to federal regulations are to the 2011 edition of the Code of Federal Regulations.

> Subject extrusions may be identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or heat sinks . . . .  Such goods are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation.

Antidumping Duty Order, 76 Fed. Reg. at 30,650-51; Countervailing Duty Order, 76 Fed. Reg. at 30,654.

The Orders expressly carve out exclusions from the scope of the Orders for certain merchandise, including "finished merchandise" and "finished goods kits."  In particular:

> The scope . . . excludes *finished merchandise* containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels.  The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "*finished goods kit*."  A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product.  An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product.

Antidumping Duty Order, 76 Fed. Reg. at 30,651 (emphases added); Countervailing Duty Order, 76 Fed. Reg. at 30,654 (emphases added).

After the Orders issued, Rubbermaid sought a ruling from Commerce that 13 of its products – containing aluminum extrusions, along with other components – are beyond the scope of the Orders.  *See* Rubbermaid's Request for Scope Ruling at 2 (July 20, 2011) (CRU Doc. No. 2) ("Request for Scope Ruling"); Final Scope Ruling at 6-7.[4]  The products include a variety of mop

---

[4]Rubbermaid's original scope inquiry request (dated July 7, 2011) was filed with Commerce on July 8, 2011.  Rubbermaid Request for Scope Ruling (CRU Doc. No. 1).  However, that original request referenced the wrong case numbers.  At Commerce's request, Rubbermaid refiled – referencing the correct case numbers – on July 20, 2011.  *See* Rubbermaid Request for Scope Ruling

frames and handles, a squeegee blade replacement, and a mopping kit.  Request for Scope Ruling

at 2-3.[5]  The mop frames and handles are specially designed to be interchangeable, and feature

swiveling mounts that allow users to connect a mop frame, for instance, to any handle in

Rubbermaid's cleaning system.  *See id.* at 2.  The products also give users the ability to "attach a

variety of damp or dry mops and cleaning cloths to [any] frame."  *Id.*

In the Request for Scope Ruling, Rubbermaid argued that all of its products are excluded

from the scope of the Orders.  *See* Request for Scope Ruling at 4-5.  In particular, Rubbermaid

argued that its mop frames and handles "fall squarely within the ["finished merchandise"] exclusion"

because the products are "fully and permanently assembled with other components at the time of

_____

(CRU Doc. No. 2) ("Request for Scope Ruling").

[5]Describing its products in greater detail, Rubbermaid explained:

The frame consists of a flat aluminum extrusion.  Rounded plastic caps are attached
to each end.  These serve to protect walls and furniture.  A swiveling, Quick-Connect
mount is attached to the center of the frame.  The mount allows the user to connect
any Quick-Connect handle in the system to the frame.  The user can attach a variety
of damp or dry mops and cleaning cloths to the frame.

The Quick-Connect handles are designed for quick attachment and detachment to the
frame and other components of the HYGEN™ Microfiber Cleaning System.  The
Q750 handle includes one extruded aluminum tube.  The Q745 and Q755 handles
include two extruded aluminum tubes.  One of the tubes is of a smaller diameter so
that it will telescope inside the other.  The telescoping tubes allow the user to adjust
the length of the handle.  All three Quick-Connect handles have a user friendly grip
on one end and a quick-connect mechanism on the other.  The quick-connect
mechanism attaches to the frames used by the HYGEN™ system.

[The] Q969 Rubbermaid Pulse™ mopping kit consists of an extruded aluminum
tube, a trigger handle, a 21 ounce refillable reservoir and an 18" Q560 wet/dry frame.
The reservoir holds cleaning solution which the user can apply to the floor using the
trigger handle.

Request for Scope Ruling at 2-3.

entry." *Id.* at 4; *see also id.* at 3 (stating that "[t]he frames, handles and mop handles are completely assembled and ready for sale to end-user[s] at the time of importation").

To determine whether a particular product is included within the scope of an antidumping or countervailing duty order, Commerce first analyzes the language of the order at issue. *See* Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (explaining that "a predicate for the interpretive process is language in the order that is subject to interpretation"). If the terms of the order alone are not dispositive, Commerce looks to the factors listed in 19 C.F.R. § 351.225(k)(1) – specifically, the descriptions of the merchandise included in the petition, in the initial investigation, and in determinations of Commerce and the International Trade Commission ("ITC"), including prior scope determinations. *See* 19 C.F.R. § 351.225(k)(1); Sango Int'l, L.P. v. United States, 484 F.3d 1371, 1376-77, 1379 (Fed. Cir. 2007).

If Commerce determines that a § 351.225(k)(1) analysis is dispositive, then Commerce issues a final scope ruling. When that analysis is not dispositive, however, Commerce considers the five additional criteria set forth in 19 C.F.R. § 351.225(k)(2), known as the Diversified Products criteria – (1) the physical characteristics of the product, (2) the expectations of the ultimate purchasers, (3) the ultimate use of the product, (4) the channels of trade in which the product is sold, and (5) the manner in which the product is advertised and displayed. *See* 19 C.F.R. § 351.225(k)(2); Diversified Products Corp. v. United States, 6 CIT 155, 572 F. Supp. 883 (1983). In conducting the scope inquiry at issue here, Commerce found the § 351.225(k)(1) analysis to be dispositive, *i.e.*, that the physical description of the subject merchandise in the Orders and in the initial investigation, together with prior scope rulings, provided a sufficient predicate for an agency determination. *See generally* Final Scope Ruling.

In its Final Scope Ruling, Commerce determined that Rubbermaid's products are not excluded from the scope of the Orders.  Final Scope Ruling at 9-10.  As to Rubbermaid's cleaning system components other than mopping kits, Commerce first determined that individual cleaning system components (for example, a mop frame or a mop handle) "do not constitute a final, finished good." *Id*. at 9.  Commerce recognized that Rubbermaid's various system components "are designed to function collaboratively [*i.e.*, in conjunction with one another] in order to form a completed cleaning device (*e.g.*, a pole connected to a frame head, which in turn is connected to a mop head or cloth)." *Id*.  However, Commerce determined that, as imported, the merchandise does not include all components needed "to make a final cleaning device," such as a mop.  *Id*.  Commerce thus found that "the components to make a final cleaning device are not part of a packaged combination at the time of importation." *Id*.  As a result, Commerce concluded that Rubbermaid's cleaning system components "do not meet the exclusion for 'finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry.'" *Id*.

In reaching its determination, Commerce relied on two previous scope determinations relating to the Orders in question.  Final Scope Ruling at 9 (citing Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Aluminum Extrusions from the People's Republic of China at 27-28 (comment 3.H) (April 4, 2011) ("Baluster Kits Determination"); Final Scope Ruling on Certain Retractable Awning Mechanisms (Oct. 14, 2011) ("Awnings Scope Ruling")).  The first determination, which assessed whether baluster kits met the exclusionary language for a "finished goods kit," concluded that the baluster kits were not excluded from the scope of the Orders because the kits "represent[ed] a packaged collection of individual parts, . . . a single element of a railing or deck system," rather than a "finished product" such as a

complete railing or deck system.  Baluster Kits Determination at 27-28; *see also* Final Scope Ruling

at 5.  The second determination, assessing whether certain imported retractable awning mechanisms

met the exclusionary language for "finished goods kit," concluded that the awning mechanisms were

not excluded because, at the time of importation, the mechanisms "lack[ed] the integral components

[*i.e.*, the textile awnings] necessary to assemble . . . full and complete finished goods kit[s]."

Awnings Scope Ruling at 9-10; *see also* Final Scope Ruling at 6.  In the Final Scope Ruling at issue

here, Commerce found Rubbermaid's products to be "no different" than the products addressed in

the Baluster Kits Determination and the Awnings Scope Ruling.  *See* Final Scope Ruling at 9 (citing

Baluster Kits Determination; Awnings Scope Ruling).

　　　　As to Rubbermaid's mopping kits, Commerce concluded that they do not constitute "finished

goods kits" because, although each kit includes "a tube, a trigger handle, a soap reservoir, and a

wet/dry frame on which disposable mops are attached," there are no disposable mop heads or mop

ends included in the kits at the time of importation.  Final Scope Ruling at 9.  And, according to

Commerce, "[a] complete mopping kit would require inclusion of a mop end to meet the

exclusionary language that defines a finished goods kit."  *Id*.

　　　　Because Commerce ruled that Rubbermaid's cleaning system components and mopping kits

do not fall within the Orders' express exclusions for "finished merchandise" and "finished goods

kits," Rubbermaid's products are subject to antidumping and countervailing duties as merchandise

within the scope of the Orders.  *See* Final Scope Ruling at 9-10.

## II.  Standard of Review

In an action reviewing a scope determination by Commerce, the agency's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (same).  Moreover, any evaluation of the substantiality of the evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn."  Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp., 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same).  That said, the mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent Commerce's determination from being supported by substantial evidence.  Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).

While Commerce must explain the bases for its decisions, "its explanations do not have to be perfect."  NMB Singapore, 557 F.3d at 1319-20.  Nevertheless, "the path of Commerce's decision must be reasonably discernable" to support judicial review.  *Id.* (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); *see generally* 19 U.S.C. § 1677f(i)(3)(A)

(requiring Commerce to "include in a final determination . . . an explanation of the basis for its

determination").

In scope determinations, Commerce "enjoys substantial freedom to interpret and clarify its

. . . orders," but Commerce "cannot 'interpret' an . . . order so as to change the scope of that order,

nor can Commerce interpret an order in a manner contrary to its terms." *See* <u>Ericsson GE Mobile</u>

<u>Communications, Inc. v. United States,</u> 60 F.3d 778, 782 (Fed. Cir. 1995); <u>Duferco Steel,</u> 296 F.3d

at 1095 (quoting <u>Eckstrom Indus., Inc. v. United States,</u> 254 F.3d 1068, 1072 (Fed. Cir. 2001)).

Antidumping and countervailing duty orders "may be interpreted as including subject merchandise

only if they contain language that specifically includes the subject merchandise or may be

reasonably interpreted to include it."  <u>Duferco Steel,</u> 296 F.3d at 1089.

### III.  <u>Analysis</u>

Rubbermaid contends that Commerce's Final Scope Ruling erred in determining that the 13

products at issue do not fall within either the "finished merchandise" exclusion or the "finished

goods kit" exclusion, and are thus subject to antidumping and countervailing duties pursuant to the

Orders.  As outlined below, Rubbermaid maintains that all but one of the 13 products fall within the

"finished merchandise" exclusion.  The exception is Rubbermaid's Q969 Pulse™ Mopping Kit,

which – unlike the other products at issue – is not entered into the U.S. as fully assembled

merchandise.  According to Rubbermaid, this final item falls within the scope of the exclusion for

"finished goods kits."

As explained in greater detail below, Commerce's Final Scope Ruling cannot be sustained,

and this matter must be remanded to the agency for further consideration.

A. <u>Final Scope Ruling on "Finished Merchandise" Exclusion</u>

Rubbermaid contends that, other than its Q969 Pulse™ Mopping Kit, all of the merchandise at issue falls within the first of the two exclusions at issue here – specifically, the "finished merchandise" exclusion, which covers "finished merchandise, containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." *See generally* Pl.'s Brief at 8-11, 12-31; Pl.'s Reply Brief, *passim*.

In support of its claim that Commerce erred in ruling to the contrary, Rubbermaid advances four basic arguments.  Rubbermaid first contends that Commerce conflated the "finished merchandise" exclusion and the second exclusion at issue in this case – *i.e.*, the exclusion for "finished goods kits."  Rubbermaid also takes issue with Commerce's focus on the fact that the merchandise at issue is designed to be used in conjunction with other merchandise.  Rubbermaid further claims that Commerce's rationale effectively precludes merchandise that is designed to be adaptable/interchangeable from being considered "finished merchandise."  In addition, Rubbermaid proffers its own definition of "finished merchandise," and relies on that definition to support its assertion that the merchandise in question falls within the "finished merchandise" exclusion.

Each of Rubbermaid's four arguments is addressed in turn below.

1. <u>Alleged Conflation of Two Exclusions</u>

Rubbermaid first claims that Commerce's analysis in the Final Scope Ruling conflated the "finished merchandise" exclusion and the "finished goods kit" exclusion, which – according to Rubbermaid – have significantly different terms.  Rubbermaid contends that Commerce, in effect,

defined the term "finished merchandise" (as the term is used in the "finished merchandise"
exclusion) by reading into it language that appears only in the exclusion for "finished goods kits."
*See generally* Pl.'s Brief at 8-9, 12-16; Pl.'s Reply Brief at 1-2.

Rubbermaid emphasizes that the requirement that imported merchandise "contains, at the
time of importation, all of the necessary parts to fully assemble a final finished good" is central to
the "finished goods kit" exclusion, but that the requirement "is found nowhere in the language of
the 'finished merchandise' exclusion."  Pl.'s Brief at 13-14; *see also* Pl.'s Reply Brief at 2-3, 5;
Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at
30,654.  Rubbermaid argues that, rather than defining the term "finished merchandise" as that term
is used in the "finished merchandise" exclusion, Commerce instead "concluded that Rubbermaid's
goods did not satisfy the ["finished merchandise" exclusion] based on factors specified in the
*second*, separate[] exclusion, that for finished goods kits."  Pl.'s Brief at 14; *see also* Pl.'s Reply
Brief at 2-4.

In support of its argument, Rubbermaid notes that Commerce's analysis in the Final Scope
Ruling here relied very heavily on two prior determinations:  the agency's Awnings Scope Ruling
and the agency's Baluster Kits Determination, both of which involved the "finished goods kit"
exclusion and therefore concerned, *inter alia*, whether the merchandise at issue in each case
"contain[ed], at the time of importation, all of the necessary parts to fully assemble a final finished
good."  *See* Pl.'s Brief at 14-15; Pl.'s Reply Brief at 3.  As the Final Scope Ruling explained,
Commerce determined in the Awnings Scope Ruling that the awning mechanisms there at issue
"lacked the integral components necessary to assemble full and complete finished goods kits, and,
thus[] . . . 'did not constitute a packaged combination of parts that contains, at the time of

importation, all of the necessary parts to fully assemble a final finished good.'" Final Scope Ruling

at 9 (quoting Awnings Scope Ruling at 9-10).  As such, Commerce determined that the awning

mechanisms did not fall within the "finished goods kit" exclusion and thus were covered by the

Orders.  The Final Scope Ruling similarly explained that the merchandise at issue in the Baluster

Kits Determination fell within the scope of the Orders because the merchandise was a "packaged

collection of individual parts, which comprised [only] a single element of a railing or deck system,"

and did not contain all necessary parts for such a system.  Final Scope Ruling at 9 (quoting Baluster

Kits Determination at 28).

Rubbermaid notes that, after briefly summarizing the Awnings Scope Ruling and the

Baluster Kits Determination, the Final Scope Ruling concluded that Rubbermaid's goods do not fall

within the "finished merchandise" exclusion because – according to Commerce – Rubbermaid's

goods "*are no different* from those addressed in [the Baluster Kits Determination] and the Awning[s]

Scope Ruling," in that "[i]ndividually, the cleaning system components at issue do not constitute a

final, finished good" and "*the components to make a final cleaning device are not part of a*

*packaged combination at the time of importation*."  *See* Pl.'s Brief at 15 (quoting Final Scope Ruling

at 9) (emphases added by Plaintiff); *see also* Pl.'s Reply Brief at 3-4.

Rubbermaid reads that latter statement (*i.e.*, that "the components to make a final cleaning

device are not part of a packaged combination at the time of importation") as a restatement of the

requirement that, to fall within the "finished goods kit" exclusion, merchandise must "contain, at

the time of importation, all of the necessary parts to fully assemble a final finished good."  *See* Pl.'s

Brief at 15-16; Pl.'s Reply Brief at 4.  Rubbermaid protests that "the Orders do *not* require that

goods falling within the first exclusion (the 'finished merchandise' exclusion) 'contain, at the time

of importation, all of the necessary parts to fully assemble a final finished good.'" Pl.'s Brief at 16

(quoting Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg.

at 30,654); *see also* Pl.'s Reply Brief at 2.  To the contrary, according to Rubbermaid, the Orders

"require only that goods falling within the first exclusion be finished goods which are fully and

permanently assembled and completed at the time of entry" – a test that Rubbermaid asserts its

goods "amply met."  Pl.'s Brief at 16.

As Rubbermaid points out, there are striking differences between the language of the

"finished merchandise" exclusion and the language of the "finished goods kit" exclusion, including,

in particular, the language that Rubbermaid highlights that requires that, to fall within the "finished

goods kit" exclusion, merchandise must "contain[], at the time of importation, all of the necessary

parts to fully assemble a final finished good."[6]  It is also true, as Rubbermaid notes, that Commerce's

analysis in the Final Scope Ruling here cited only prior determinations that involved the "finished

goods kit" exclusion, and that the language that the agency used in the Final Scope Ruling was much

closer to the language of the "finished goods kit" exclusion than it was to the language of the

"finished merchandise" exclusion.  Indeed, in addition to the general phrasing that Rubbermaid

emphasizes, the Final Scope Ruling specifically concluded that Rubbermaid's merchandise is not

a "final, finished good" (a term used in the "finished goods kit" exclusion, but conspicuously absent

---

[6]Rubbermaid further observes that "[t]he goods covered by the first exclusion are simply
described as 'finished merchandise,'" while "the goods covered by the second exclusion are
described . . . as kits containing all of the necessary parts to fully assemble a 'final finished good,'"
which Rubbermaid asserts is "a different standard than a 'finished good.'"  Pl.'s Brief at 16 n.2.  In
other words, the two exclusions at issue here use three similar but different terms – "finished
merchandise," "finished goods," and "final finished goods" – with no indication as to whether, or
how, their meanings differ.

from the "finished merchandise" exclusion), and also made reference to "a packaged combination" (again, a term used in the "finished goods kit" exclusion, but missing from the "finished merchandise" exclusion). *Compare* Final Scope Ruling at 9 *and* Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654.

    All in all, Rubbermaid makes out a reasonably colorable case that, in evaluating whether the merchandise at issue falls within the "finished merchandise" exclusion, Commerce subjected that merchandise to a requirement that is relevant only to the "finished goods kit" exclusion. The Government, on the other hand, maintains that Commerce's Final Scope Ruling did not conflate the two exclusions. The Government argues that, at the time of the Final Scope Ruling, Commerce had not yet issued a determination concerning the "finished merchandise" exclusion, and that it was therefore entirely appropriate for the agency here to rely on the Awnings Scope Ruling and Baluster Kits Determination, even though both of those determinations concerned only the "finished goods kit" exclusion. *See* Def.'s Brief at 13-14. The Government characterizes the language of the two exclusions as "very similar," and asserts that the sole difference between the two is that the "finished merchandise" exclusion covers merchandise that contains aluminum extrusions as parts and is "fully and permanently assembled at entry" while the "finished goods kit" exclusion covers merchandise that contains aluminum extrusions as parts and is "unassembled at entry." *See id.* at 12-13.

    There is a seductive logic and symmetry to the notion that the two exclusions are intended to largely parallel one another, with one exclusion addressed to merchandise that is already assembled at the time of entry and the other exclusion addressed to merchandise that is unassembled. However, if that was Commerce's intent, the agency could have made that intention more clear, by using much the same terminology in the two provisions. It is an elementary canon of construction

that, if the same language is used in two different provisions, the language is presumed to have the same meaning.  *See generally* 2A N. Singer & S. Singer, Sutherland on Statutory Construction § 46:6 (7th ed. 2014).  By the same token, where – as here – the language that is used is different, it is reasonable to assume that different meanings were intended.

In any event, the Government's explanation of the relationship between the two exclusions must be disregarded as impermissible *post hoc* rationale.  It is black letter law that an agency determination cannot be sustained on the basis of a rationale supplied after-the-fact by litigation counsel.  *See* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962).  As the Supreme Court has explained, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 50.

On the strength of the existing record, it is impossible to say whether or not Commerce applied the proper test in determining that Rubbermaid's merchandise does not fall within the "finished merchandise" exclusion.  On the strength of the existing record, it is not even possible to discern Commerce's definition of "finished merchandise." Accordingly, Rubbermaid's motion must be granted as to its claim concerning the "finished merchandise" exclusion, and this matter must be remanded to Commerce to afford the agency the opportunity to address Rubbermaid's arguments directly and in detail, and, among other things, to permit the agency to supply a clear and cogent definition of "finished merchandise" (and other key terms, as necessary), to clarify the reach of the "finished merchandise" exclusion, to explain the relationship between the "finished merchandise" exclusion and the "finished goods kit" exclusion (taking into consideration the differences in the language of the two provisions), and, if appropriate, to reconsider the agency's determination on the applicability of the "finished merchandise" exclusion to the merchandise at issue here.

2.  Treatment of Merchandise Designed to Function
in Conjunction With Other Merchandise

Rubbermaid further contends that Commerce erred in the Final Scope Ruling by (implicitly)

defining "finished merchandise" to exclude all merchandise that is designed to function

collaboratively, "in conjunction with other parts" or components that are not included at the time

of importation.  *See generally* Pl.'s Brief at 21-25; Pl.'s Reply Brief at 2.  Rubbermaid argues that

Commerce determined that the merchandise at issue does not fall within the "finished merchandise"

exclusion because the products are "designed to function collaboratively in order to form a

completed cleaning device" and "the components to make a final cleaning device are not part of a

packaged combination at the time of importation."  *See* Pl.'s Brief at 21 (quoting Final Scope Ruling

at 9).  Stressing that its products are "missing no parts required to perform their functions as mop

handles, mop frames, etc." and that the products are not "subject to any further manufacturing or

processing," Rubbermaid challenges Commerce's conclusion that the products "cannot be finished

merchandise because they are designed to function in conjunction with other parts."  Pl.'s Brief at

21.

As a threshold matter, Rubbermaid asserts that there is nothing in the "common meaning"

of the terms "finished goods" and "finished merchandise" which would limit those terms to only

those goods that are not intended to be attached to, or used in conjunction with, other merchandise.

Pl.'s Brief at 21.[7]  The Government does not dispute this point.

---

[7]Rubbermaid argues that – if "finished goods" and "finished merchandise" were interpreted
to limit the terms to only those goods that are not intended to be attached to, or used in conjunction
with, other merchandise – "goods that are widely considered by the commercial world to be
'finished,' such as, for example, seats to be installed in automobiles, batteries to be installed in

Rubbermaid also argues that defining "finished merchandise" in such a way as to exclude merchandise simply because that merchandise is designed to function collaboratively, "in conjunction with other parts" or components that are not included at the time of importation contravenes the language of the Orders themselves.  Rubbermaid notes in particular that the scope language in the Orders lists "finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels" as examples of "finished merchandise" containing aluminum extrusions as parts that fall within the "finished merchandise" exclusion.  *See* Pl.'s Brief at 22.  And Rubbermaid argues that – like the Rubbermaid products at issue here – each and every one of the examples of products covered by the "finished merchandise" exclusion that are listed in the Orders "must be attached to or work in conjunction with other goods in order to fulfill its ultimate intended function." *Id.*  Thus, Rubbermaid concludes, sustaining the construction of the "finished merchandise" exclusion that Commerce set forth in the Final Scope Ruling here "would render the portion of the Orders listing examples of finished goods excluded from the Orders a nullity, because none of the[] enumerated goods would be able to meet the 'test' used by [Commerce] in the Scope Ruling." *Id.*

The Government casts Rubbermaid's position as a slippery slope.  According to the Government, "Rubbermaid's interpretation of 'finished' as including any aluminum extrusions product that is fabricated and identified by an end-use, such as a mop frame, renders all products 'finished,' in opposition to the language of the scope of the Orders, which includes parts for final

---

radios, bearings for use in machinery, etc., could never be considered 'finished,' but would only be considered to be 'intermediate goods.'"  Pl.'s Brief at 21-22.

finished goods." Def.'s Brief at 11.[8] *But see* Pl.'s Reply Brief at 11-12, 12-14. However, the Government ignores the elephant in the room. To date, neither Commerce nor the Government has made any effort to explain how or why the fact that Rubbermaid's products "must be attached to or work in conjunction with other goods in order to fulfill [their] ultimate intended function[s]" precludes Rubbermaid's merchandise from falling within the "finished merchandise" exclusion, when – at the same time – each of the referenced examples of products listed in the Orders as covered by the "finished merchandise" exclusion also "must be attached to or work in conjunction with other goods in order to fulfill its ultimate intended function."

As Rubbermaid aptly observes: "'Finished windows with glass' cannot serve their function (to allow the occupants of a room or building to view outside that room or building) until they are attached to a window frame, and, ultimately to a house or building. 'Doors with glass or vinyl'

---

[8]For example, the scope language of the Orders states (in relevant part):

> Subject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, window frames, door frames, solar panels, curtain walls, or furniture. Such parts that otherwise meet the definition of aluminum extrusions are included in the scope. The scope includes the aluminum extrusion components that are attached (*e.g.*, by welding or fasteners) to form subassemblies, *i.e.*, partially assembled merchandise unless imported as part of [a] finished goods "kit" . . . . The scope does not include the non-aluminum extrusion components of subassemblies or subject kits.
>
> Subject extrusions may be identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or heat sinks . . . . Such goods are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation.

Antidumping Duty Order, 76 Fed. Reg. at 30,650-51; Countervailing Duty Order, 76 Fed. Reg. at 30,654.

cannot serve their function (to allow or bar ingress to or egress from a room or building) until they are attached to a door frame, and again, to a house or building.  'Picture frames with glass pane and backing material' cannot serve their ultimate function (to display pictures or other graphic material of [a user's] choice) until the user inserts the picture or other graphic material into the picture frame.  'Solar panels' cannot serve their ultimate function (to collect solar energy) until they are installed in or attached to the roof a building or house."  Pl.'s Brief at 22; *see also* Pl.'s Reply Brief at 5-6, 13.

The question that lies at the heart of this case is this:  If – as Commerce ruled here – Rubbermaid's products are not "finished merchandise" but are instead (in essence) "mop parts," why are doors and windows "finished merchandise" and not mere "house parts" or "building parts"?  Thus far, Commerce and the Government have offered little more than *ipse dixit*.  It seems that Commerce's position on "finished merchandise" is akin to Justice Potter Stewart's take on obscenity – Commerce can't  define it, but it "know[s] it when [it] see[s] it."  *See* Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

On remand, Commerce shall reconsider its analysis of the "finished merchandise" exclusion and its application to merchandise that is designed to function in conjunction with other merchandise that is not included at the time of importation, and, among other things, shall articulate a clear and coherent rationale for distinguishing between Rubbermaid's merchandise and the examples of goods listed in the Orders as falling within the "finished merchandise" exclusion (assuming that the agency continues to draw such a distinction).

In a related argument, Rubbermaid emphasizes the fact that the domestic producers' Petition in the underlying antidumping and countervailing duty investigations distinguished between *finished*

*goods* containing aluminum extrusions (which were to be excluded from the scope of the Orders) and *intermediate goods* containing aluminum extrusions (which were to fall within the scope of the Orders).  *See* Pl.'s Brief at 23-24 (citing Petition For The Imposition of Antidumping And Countervailing Duties Against Aluminum Extrusions From The People's Republic of China (March 31, 2010) ("Petition")).  That distinction between excluded finished goods and included intermediate goods was consistent with the Petition's description of the physical characteristics and uses of the domestic like product: "The extrusions produced generally serve as intermediate parts in a wide range of downstream products."  *See* Pl.'s Brief at 24 (quoting Petition at 17).  To the same end, Rubbermaid also points to the Preliminary Report of the U.S. International Trade Commission ("ITC") in the underlying investigations, which stated that the aluminum extrusions subject to investigation "*are all used as inputs* (*i.e.*, *an intermediate product*) *in the production of downstream products*."  *See* Pl.'s Brief at 24 (quoting Certain Aluminum Extrusions From China: Investigation Nos. 701-TA-475 and 731-TA-1177 (Preliminary), USITC Pub. 4153 at I-8 – I-9 (June 2010) ("ITC Preliminary Report" or "ITC Report")) (emphasis added by Plaintiff).

Rubbermaid invokes the evidence summarized above as additional support for its claim that Commerce erred in the Final Scope Ruling by (in effect) treating Rubbermaid's merchandise as "intermediate goods" solely because the products function only in conjunction with other merchandise.  Rubbermaid argues that "the common and commercial understanding of an 'intermediate' good . . . does *not* encompass fully . . . manufactured, finished products" such as the merchandise at issue here.  Pl.'s Brief at 24.  To illustrate its point, Rubbermaid cites to a U.S. Department of Labor source for the proposition that the "category of intermediate materials, supplies, and components consists partly of already processed commodities that require further

processing. Examples of such semifinished goods include flour, cotton yarn, steel mill products, and lumber." *Id.* (citing Bureau of Labor Statistics). Rubbermaid states that, according to the Labor Department source, "[t]he intermediate goods category also encompasses nondurable, physically complete goods purchased by business firms as inputs for their operations. Examples include diesel fuel, belts and belting, paper boxes, and fertilizers." Pl.'s Brief at 24-25 (citation omitted).

Rubbermaid sums up by asserting that its mop handles and mop frames "are clearly not 'semifinished' *intermediate* goods that require further processing, nor are they goods such as diesel fuel that [is] consumed as [an] input[] for business operations." Pl.'s Brief at 25. To the contrary, according to Rubbermaid, its products are "finished, completely manufactured products ready for sale to the ultimate consumer." *Id.* Rubbermaid concludes that the Final Scope Ruling improperly "treated *finished* goods as *intermediate* goods, in derogation of the clear division between the two outlined in the Petition." *Id.*

The Government treats Rubbermaid's argument as little more than a straw man. The Government first reduces the argument to a bare claim that "the Petition demonstrates that the scope [of the Orders] was not intended to include 'fully assembled finished goods containing aluminum extrusions.'" *See* Def.'s Brief at 14.[9] The Government then responds by "agree[ing] that finished

---

[9]The Government raises an initial objection to Rubbermaid's reliance on the language of the Petition and the ITC Report, asserting that Rubbermaid "did not argue during the scope proceeding that these sources supported the exclusion of its products, and so failed to exhaust its administrative remedies," but then proceeds to address the merits of Rubbermaid's points. *See* Def.'s Brief at 14. Rubbermaid responds that it "fully raised the issue (that its products are finished goods and therefore must be excluded from the scope as 'finished merchandise') for which these sources [*i.e.*, the Petition and the ITC Report] are cited as support in [Rubbermaid's] submissions in the scope proceeding," which (Rubbermaid contends) were "more than adequate to apprise [Commerce] of the issue to which it would specifically need to respond." Pl.'s Reply Brief at 12 n.3. Even more to the point, however, Rubbermaid underscores that the specific sources in question – *i.e.*, the

merchandise is excluded from the scope of the Orders," but asserting that "this fact does not assist Rubbermaid because its products are not finished merchandise." *Id.* Rubbermaid's arguments and evidence merit greater consideration.

As to Rubbermaid's reliance on the language in the ITC Report indicating that the aluminum extrusions which were subject to the investigations "are all used as inputs (*i.e.*, an intermediate product) in the production of downstream products," the Government quotes language elsewhere in the same report stating that "aluminum extrusions are used in a wide variety of applications." *See* Def.'s Brief at 14-15 (quoting ITC Preliminary Report). But the language that the Government quotes does not in any way diminish the significance of the excerpt on which Rubbermaid relies. On remand, Commerce shall take into account Rubbermaid's points concerning the language of the Petition and the ITC Report, and shall reflect the agency's consideration of those points in the agency's remand determination.

3. <u>Treatment of Merchandise Specifically Designed to Be Adaptable and Interchangeable</u>

Rubbermaid also argues that Commerce's (implicit) definition of "finished goods" in the Final Scope Ruling is flawed because – to the extent that (as here) some component is not included in the merchandise as imported – Commerce's definition excludes merchandise that is designed to be adaptable, interchangeable, and flexible, and thus limits "finished goods" to merchandise that is designed to be permanently assembled (and not adaptable, interchangeable, and flexible). *See generally* Pl.'s Brief at 25-31; Pl.'s Reply Brief at 6-8.

---

Petition and the ITC Report – are documents that 19 C.F.R.§ 351.225(k)(1) obligated Commerce to consider in any event. *Id.*

Rubbermaid argues that – unlike conventional cleaning products – its products are specifically designed "to provide ultimate flexibility and adaptability to the ultimate consumer, and to be connected, disconnected, and reconnected in whichever combination best suits the consumer's cleaning needs at any particular time."  Pl.'s Brief at 25; *see also id.* at 26-27.  As Rubbermaid explains, "[t]here is no one 'permanent' combination of the various components" of Rubbermaid's cleaning system; "rather, the components are designed to be assembled and reassembled to meet the user's changing needs at any particular point in time."  *Id.* at 27.  Under such circumstances, Rubbermaid maintains, "the presence or absence of any particular component at importation cannot serve as any reasonable basis for a conclusion that the components are not 'finished merchandise.'"  *Id.*

To buttress its argument on this point, Rubbermaid relies on two scope rulings issued by Commerce in cases where the merchandise at issue could serve its ultimate function only when used in conjunction with some component not included with the merchandise at the time of importation – the Banner Stands Ruling and the EZ Fabric Wall Systems Ruling.  *See generally* Pl.'s Brief at 27-31 (discussing Final Scope Ruling on Banner Stands and Back Wall Kits (Oct. 19, 2011) ("Banner Stands Ruling"); Final Scope Ruling on EZ Fabric Wall Systems (Nov. 9, 2011) ("EZ Fabric Wall Systems Ruling")); *see also* Pl.'s Reply Brief at 6-8.  Because the merchandise at issue was designed to be modified or adapted according to the end user's specifications and needs, Commerce found in both cases that it would be unreasonable for the agency to conclude that the absence of an interchangeable component precluded treatment of the goods as "finished good kits" for purposes of the "finished goods kit" exclusion.

The merchandise at issue in the Banner Stands Ruling consisted of banner stands and back

wall kits that were designed to showcase graphics and other marketing materials at trade shows and exhibitions.  Banner Stands Ruling at 7.  At the time of importation, the merchandise included a base, a folding pole, and top trim, but was missing graphics and marketing materials.  *Id.*  Commerce ultimately found that the merchandise was specifically designed to incorporate interchangeable graphic materials, depending on the particular user's needs.  *Id.* at 10.  Commerce therefore determined that it was not reasonable to require that the merchandise "be accompanied with affixed graphical material that cannot be removed or altered at a later date" in order for the merchandise to be treated as "finished goods kits" for purposes of the "finished goods kit" exclusion.  *Id.* Commerce concluded that the banner stands and back wall kits at issue were excluded from the scope of the Orders.  *Id.* at 1, 9-11; *see generally* Pl.'s Brief at 27-28; Pl.'s Reply Brief at 7.

Similarly, at issue in the EZ Fabric Wall Systems Ruling were temporary commercial displays which were designed to incorporate fabric panels with printed graphics.  EZ Fabric Wall Systems Ruling at 7.  At the time of importation, the merchandise included wall units, headers, and columns, but fabric panels were missing.  *Id.* at 7, 10.  In its scope ruling, Commerce found that the fabric panels were not integral, permanent parts of the wall systems.  *Id.* at 10.  Commerce therefore determined that it was not reasonable to rule that the status of the wall systems as "finished goods kits" was dependent on whether or not "readily interchangeable fabric covers with graphics" accompanied the merchandise at the time of importation.  *Id.*  As with the merchandise at issue in the Banner Stands Ruling, Commerce concluded that the merchandise at issue in the EZ Fabric Wall Systems Ruling was excluded from the scope of the Orders as "finished goods kits," notwithstanding the fact that – due to the merchandise's interchangeable design – the merchandise as imported did not include all components necessary for it to serve its intended function.  *Id.*; *see generally* Pl.'s

Brief at 28-30; Pl.'s Reply Brief at 7.

For much the same reasons articulated by Commerce in the Banner Stands Ruling and in the EZ Fabric Wall Systems Ruling, Rubbermaid contends that "it was unreasonable for the [agency] to in essence require that [the company's] cleaning system components be imported in any one particular configuration so as to be considered out-of-scope merchandise," because those components "are not designed to be permanently affixed or combined in any one combination." Pl.'s Reply Brief at 7.  To the contrary, Rubbermaid's cleaning system components "are designed to be flexible, replaceable, and interchangeable, and to be configured and reconfigured according to the end user's particular cleaning needs over the life of the products."  *Id.*

Neither the Banner Stands Ruling nor the EZ Fabric Wall Systems Ruling was addressed in the Final Scope Ruling here.[10]  And the Government's brief gives the two rulings very short shrift. The Government argues that the scope language in the Orders "makes no distinction as to whether [the] assembly [of subject merchandise assembled after importation] is permanent or flexible." Def.'s Brief at 15.  In addition, the Government argues that, in both the Banner Stands Ruling and the EZ Fabric Wall Systems Ruling, the merchandise in question was display kits and the missing components were "graphical material" which was "meant to be created and inserted by a downstream consumer after importation." *See id.*  The Government thus seeks to distinguish the two cases that Rubbermaid cites from the facts of this case, asserting that the missing components in the other two cases were created by the user, and were not "known and limited to" a manufacturer's specific parts, as in this case.  *Id.* at 15-16.

---

[10]Although the EZ Fabric Wall Systems Ruling post-dated the Final Scope Ruling in this case, the Banner Stands Ruling was issued prior to the Final Scope Ruling.

The Government's arguments are unavailing.  To the extent that the Government suggests that it is immaterial whether the assembly of merchandise following importation is "permanent or flexible," the Government seems to miss the point of the two rulings, which focused on – and gave great weight to – the flexible, adaptable, interchangeable nature of the merchandise.  Thus, as Rubbermaid puts it, the gravamen of the two rulings is that "finished goods which must work in combination with other goods to form a flexible, interchangeable system are not rendered mere in-scope 'parts' simply because some of the components of the combination are missing at the time of importation."  *See* Pl.'s Reply Brief at 7-8.

The Government's attempt to distinguish the facts of the other two cases from the facts here is equally lacking in substance.  Contrary to the Government's implication, Commerce did not base its rulings in those cases on the fact that the components missing at the time of importation were to be "created by the customer."  *See* Def.'s Brief at 15-16.  Instead, the focus of Commerce's rulings was on the fact that – like Rubbermaid's components here – "the graphic material was designed to be impermanent and replaceable, and . . . that the *entire system* [therefore] was designed to be flexible and interchangeable."  Pl.'s Reply Brief at 8.

On remand, Commerce shall consider Rubbermaid's arguments concerning the interchangeable and adaptable design of the company's merchandise directly and in detail, in light of the Banner Stands Ruling and the EZ Fabric Wall Systems Ruling (in addition to any other rulings, as appropriate), and the agency shall reflect that review in its remand determination.

4.   <u>Rubbermaid's Proposed Definition of "Finished Merchandise"</u>

Quite apart from Rubbermaid's numerous attacks on the (implicit) definition of "finished merchandise" that Commerce applied in the Final Scope Ruling here (discussed above), Rubbermaid also proposes its own definition of "finished merchandise" and argues that its products satisfy that definition.   Specifically, relying on dictionaries and other specialized lexicographic sources, Rubbermaid argues that "finished merchandise" ("finished goods") means "goods as to which the manufacturing process has been fully completed, ready for sale to the ultimate user."  Pl.'s Brief at 17; *see generally id*. at 17-20.  Rubbermaid further asserts that each of its products at issue meets the definition of "finished merchandise" that it proposes, because, *inter alia*, its products are "at the time of importation, complete, and will undergo no further assembly, processing, or manufacture"; because each product "at the time of importation, contains all necessary parts and properties to perform its function as a mop handle or mop frame"; and because each product "is, at the time of importation, intended and ready for sale (through Rubbermaid's distributors) to the ultimate consumer, who after purchase will configure and reconfigure the components in whichever combination is required to meet the consumer's cleaning needs."  *Id.* at 19-20.

The Government objects that Rubbermaid's proposed definition of "finished merchandise" "would exclude any aluminum extrusion with an identified end-use that is ready for use at the time of importation" and argues that the proposed definition therefore must be rejected because, according to the Government, the proposed definition would effectively nullify portions of the scope language in the Orders.  *See* Def.'s Brief at 10; *see also id*. at 9 (noting that scope language of Orders includes "subject aluminum extrusions [that] are described at the time of importation as parts for final finished products that are assembled after importation" and aluminum extrusions that are

"identified with reference to their end use").  The Government quotes the scope language in the

Orders which specifies that aluminum extrusions are "subject merchandise if they otherwise meet

the scope definition, *regardless* of whether they are ready for use at the time of importation." *Id.*

at 10-11 (quoting Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76

Fed. Reg. at 30,654).  *But see* Pl.'s Brief at 20 n.4 (analyzing the scope language on which the

Government relies); Pl.'s Reply Brief at 8-10.

Whatever may be the merits of the Government's position, it is not sufficient for Commerce

(or the Government) to content itself with poking holes in definitions that Rubbermaid or other

parties proffer.  If Commerce is going to rule (as it has) that Rubbermaid's products are not "finished

merchandise," then it is incumbent upon Commerce to affirmatively define that term (as well as any

other terms on which the agency's rationale relies).  In any event, there is no need to reach the

substance of the parties' respective positions at this time.  Defining "finished merchandise" is

properly the prerogative of Commerce – not Rubbermaid, and not the court – at least in the first

instance.  On remand, Commerce shall do so in accordance with all instructions above, and taking

into account Rubbermaid's proposed definition of the term.  *See generally* Tak Fat Trading Co. v.

United States, 396 F.3d 1378, 1382 (Fed. Cir. 2005) (explaining that court accords substantial

deference to Commerce's interpretation of its own orders); Sandvik Steel Co. v. United States, 164

F.3d 596, 600 (Fed. Cir. 1998) (noting that "the order's meaning and scope are issues particularly

within [Commerce's] expertise").

B.  <u>Final Scope Ruling on Exclusion for "Finished Goods Kits"</u>

The last of the 13 pieces of merchandise subject to this action is Rubbermaid's Q969 Pulse™

Mopping Kit, which Rubbermaid contends falls under the second of the two exclusions at issue here

– specifically, the "finished goods kit" exclusion.  Pl.'s Brief at 31 n.5.  That exclusion covers

"finished goods containing aluminum extrusions that are entered unassembled in a 'finished goods

kit,'" which, in turn, is described in the Orders (in relevant part) as "a packaged combination of parts

that contains, at the time of importation, all of the necessary parts to fully assemble a final finished

good and requires no further finishing or fabrication, . . . and is assembled 'as is' into a finished

product."  Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed.

Reg. at 30,654.[11]

---

[11]As noted above, according to Rubbermaid, the Pulse™ Mopping Kit is the only one of the 13 items at issue that is not entered into the U.S. as fully assembled merchandise, which is why Rubbermaid contends that it is excluded from the scope of the Orders under the "finished goods kit" exclusion (rather than the "finished merchandise" exclusion). *See, e.g.*, Pl.'s Brief at 14 (explaining that, "[w]ith the exception of a single product (the Rubbermaid Pulse Mopping Kit . . . ), the products [at issue] are imported fully, completely, and permanently assembled," and that Rubbermaid therefore claimed in its Request for Scope Ruling that all merchandise other than the Pulse™ Mopping Kit "fell within the *first* exclusion, for finished merchandise"); Pl.'s Reply Brief at 5 (stating that, "[w]ith the exception of the mopping kit, Rubbermaid's goods did not enter unassembled").

In its briefs in this forum, Rubbermaid is crystal clear that the Pulse™ Mopping Kit is the only piece of merchandise that it claims is covered by the exclusion for "finished goods kits." *See, e.g.*, Pl.'s Brief at 9 (stating that, "[w]ith the exception of one product (the Rubbermaid Pulse Mopping Kit), Rubbermaid demonstrated that all of the goods for which it sought a scope ruling fell within the ["finished merchandise"] exclusion"); *id*. at 14 (explaining that "Rubbermaid explicitly and specifically claimed when seeking the scope ruling that with the exception of the Rubbermaid Pulse Mopping Kit, its goods fell within the . . . exclusion . . . for finished merchandise"); *see also* Pl.'s Reply Brief at 4 n.1 (noting that, in its Request for Scope Ruling, "Rubbermaid claimed that the 'finished goods kit' exclusion applied to one imported product, a mopping kit"); *id*. at 5 (stating that, "[w]ith the exception of the mopping kit" (singular), "Rubbermaid's goods did not enter unassembled").

In its Final Scope Ruling, Commerce concluded that Rubbermaid's mopping kits do not constitute "finished goods kits," because – even though the kits include "a tube, a trigger handle, a soap reservoir, and a wet/dry frame" – the kits "lack . . . disposable mop ends at the time of importation" and, according to Commerce, "[a] complete mopping kit would require inclusion of a mop end to meet the exclusionary language that defines a finished goods kit."  Final Scope Ruling at 9.  But Rubbermaid argues that – much like the graphic material and the fabric walls that were missing from the merchandise at issue in the Banner Stands Ruling and in the EZ Fabric Wall Systems Ruling – the disposable mop ends or mop heads that are not included in Rubbermaid's mopping kit are "specifically designed to be impermanent, disposable, and replaceable."  Pl.'s Brief at 30; *see also id*. at 31 n.5 (citing EZ Fabric Wall Systems Ruling for proposition that a component that is interchangeable is not a necessary component under the exclusionary language for "finished goods kit").

As discussed in section III.A.3 above, both the Banner Stands Ruling and the EZ Fabric Wall Systems Ruling involved the "finished goods kit" exclusion, and, in both cases, Commerce concluded that the merchandise at issue was excluded from the scope of the Orders as "finished goods kits," despite the fact that – due to the merchandise's interchangeable design – the merchandise as imported did not include all components necessary for it to serve its intended

---

However, it appears that – in the Final Scope Ruling – Commerce analyzed two other Rubbermaid products under the rubric of "mopping kits," in addition to the Pulse™ Mopping Kit. *See* Final Scope Ruling at 9 n.11 (referring to the "Q979 Flow Finish Flow Kit Flat" and the "Q989 Flow Finish Flow Kit String," in addition to the "Q969 Rubbermaid Pulse Mopping Kit"); *see also* Def.'s Brief at 3-4 (stating that Rubbermaid "imports a mopping kit, which includes an aluminum extrusions tube, a trigger handle, a reservoir and a wet/dry frame, as well as two other mopping kits, both of which include a frame, handle, and portable reservoir").

function.  *See* EZ Fabric Wall Systems Ruling at 10; Banner Stands Ruling at 9-10.  In the words

of Commerce in its EZ Fabric Wall Systems Ruling, the fabric walls that were missing when the

merchandise at issue there was imported were "designed to be readily interchangeable and to be

modified according to the end user's needs and specifications," and thus did not constitute "integral

components" that were "necessary to assemble a full and complete 'finished goods kit.'"  EZ Fabric

Wall Systems Ruling at 10.  So too Rubbermaid here argues that the mop ends or mop heads in

question are not "integral components" that are "necessary to assemble a full and complete 'finished

goods kit,'" because they are specifically designed to be not only "readily interchangeable," but –

in fact – "ultimately disposable."  Pl.'s Brief at 31 n.5; *see also id*. at 30.

For its part, the Government characterizes the mop ends or mop heads as "necessary for the

*functionality* of the finished product" and seeks to analogize the mop ends or mop heads to the

textile covers in the Awnings Scope Ruling.  Def.'s Brief at 16 (emphasis added).  However,

Commerce's scope ruling must stand or fall based on the reasoning articulated by the agency itself.

No weight can be accorded to counsel's *post hoc* focus on "functionality."  *See* Motor Vehicle Mfrs.

Ass'n, 463 U.S. at 50; Burlington Truck Lines, 371 U.S. at 168-69.  In any event, in rulings such

as the Banner Stands Ruling and the EZ Fabric Wall Systems Ruling, Commerce has determined that

merchandise may fall within the scope of the "finished goods kit" exclusion even if the merchandise

as imported does not contain all components necessary to the functionality of the product.  *See*

*generally* Banner Stands Ruling; EZ Fabric Wall Systems Ruling.

In light of the above, Commerce's determination in the Final Scope Ruling that the

Rubbermaid's Q969 Pulse™ Mopping Kit does not fall within the "finished goods kit" exclusion

cannot stand.  Rubbermaid's motion must be granted as to its claim concerning the "finished goods

kit" exclusion, and this matter must be remanded to Commerce for further consideration, taking into

consideration, among other things, the assertedly "infinitely flexible and interchangeable" nature

of Rubbermaid's merchandise (*see* Pl.'s Brief at 30), and taking into consideration the Banner

Stands Ruling, the EZ Fabric Wall Systems Ruling, and other any other applicable rulings that may

be relevant.  *See generally* section III.A.3, *supra* (addressing significance of the adaptable,

interchangeable nature of Rubbermaid's merchandise for purposes of "finished merchandise"

exclusion).

## C. Resort to the Diversified Products Criteria

As a parting shot, Rubbermaid argues in the alternative that – in the event that the factors

listed in 19 C.F.R. § 351.225(k)(1) (*i.e.*, the descriptions of the merchandise set forth in the petition,

in the initial investigation, and in other determinations by Commerce and the ITC, including prior

scope determinations) should be found not to be dispositive – Rubbermaid's merchandise

nevertheless would be "clearly excluded from the scope of the Orders under the Diversified Products

criteria set forth in 19 C.F.R. § 351.225(k)(2)."  *See generally* Pl.'s Brief at 31-33; section I, *supra*

(discussing Diversified Products criteria).

As the Government notes, however, Commerce here determined that the scope language of

the Orders, as well as the sources listed in 19 C.F.R. § 351.225(k)(1), were dispositive.  *See*

*generally* Def.'s Brief at 17-18; Final Scope Ruling at 9.[12]  And, although this matter is being

---

[12]As an initial matter, the Government argues that Rubbermaid waived any right to argue its case under 19 C.F.R. § 351.225(k)(2) and the Diversified Products criteria because the company did not raise any such argument before Commerce.  *See* Def.'s Brief at 17-18.  In light of the disposition herein, there is no need now to address this exhaustion argument.

remanded to Commerce for further consideration, no party has suggested that resort to 19 C.F.R. §

351.225(k)(2) and the <u>Diversified Products</u> criteria is necessary.  There is therefore no need to reach

Rubbermaid's <u>Diversified Products</u> claims at this time.

## IV. <u>Conclusion</u>

For the reasons set forth above, Plaintiff's Motion for Judgment on the Agency Record must

be granted, and this matter remanded to the Department of Commerce for further action not

inconsistent with this opinion.

A separate order will enter accordingly.


                                                              /s/ Delissa A. Ridgway
                                                             Delissa A. Ridgway
                                                                      Judge

Dated:   September 23, 2014
            New York, New York