Slip Op. 15-79

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| RUBBERMAID COMMERCIAL PRODUCTS LLC, : | |
| *Plaintiff*, : | |
| v. : | Court No. 11-00463 |
| UNITED STATES, : | |
| *Defendant*. : | |

[Sustaining Commerce's remand results revising interpretation of exclusions from scope of antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China]

Dated:  July 22, 2015

Daniel J. Cannistra and Alexander H. Schaefer, Crowell & Moring LLP, of Washington, D.C., for Plaintiff.

Tara K. Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant.  With her on the brief were Benjamin C. Mizer, Acting Assistant Attorney General, and Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch.  Of counsel on the brief was Jessica M. Link, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

## OPINION

RIDGWAY, Judge:

In this action, Plaintiff Rubbermaid Commercial Products LLC ("Rubbermaid") – a U.S. importer of certain cleaning system components – contested the determination of the U.S. Department of Commerce ("Commerce") that 13 of the company's products were within the scope of the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China.  *See* Final Scope Ruling on Certain Cleaning System Components (Oct. 25, 2011) ("Scope Ruling"); Aluminum Extrusions from the People's Republic of China: Antidumping

Duty Order, 76 Fed. Reg. 30,650 (May 26, 2011) ("Antidumping Duty Order"); Aluminum Extrusions From the People's Republic of China: Countervailing Duty Order, 76 Fed. Reg. 30,653 (May 26, 2011) ("Countervailing Duty Order").

Each of the 13 Rubbermaid products at issue consists of one or more aluminum extrusions, along with other components. The products include a variety of mop frames and handles, as well as mopping kits. The mop frames and handles are specially designed to be interchangeable, and feature swiveling mounts that allow users to connect any mop frame, for instance, to any handle in Rubbermaid's cleaning system. The products' interchangeable design also gives users the ability to attach a variety of damp or dry mops and cleaning cloths to any frame.

Rubbermaid argued that its 13 products should be excluded from the coverage of the Antidumping and Countervailing Duty Orders based on language defining the scope of the Orders to exclude "finished merchandise" and "finished goods kits." The Orders state:

> The scope . . . excludes *finished merchandise* containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels. The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "*finished goods kit*." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, *etc*. in the packaging with an aluminum extrusion product.

Antidumping Duty Order, 76 Fed. Reg. at 30,651 (emphases added); Countervailing Duty Order, 76 Fed. Reg. at 30,654 (emphases added).

In sum and substance, Commerce's Scope Ruling stated that the bulk of the Rubbermaid

products at issue (*i.e.*, the mop frames and handles)[1] were no different from the retractable awnings and the baluster kits that the agency had previously ruled to be within the scope of the Orders. *See generally* Scope Ruling at 9 (discussing Issues and Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Aluminum Extrusions from the People's Republic of China at 27-28 (Comment 3.H) (April 4, 2011) ("Baluster Kits Scope Determination"); Final Scope Ruling on Certain Retractable Awning Mechanisms (Oct. 14, 2011) ("Retractable Awnings Scope Ruling")).

Commerce's Scope Ruling here explained that, in its Retractable Awnings Scope Ruling, the agency concluded that imported awnings "lacked the integral components necessary to assemble full and complete finished goods kits" because they did not include the fabric covers, and, thus, the awnings "did not constitute a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good." *See* Scope Ruling at 9 (quoting Retractable Awnings Scope Ruling). The Scope Ruling here also noted that Commerce had similarly concluded that baluster kits "were within the scope of the Order[s] because they represented a 'packaged collection of individual parts, which comprised a single element of a railing or deck system, and, therefore, did not represent a finished product.'" *Id*. (quoting Baluster Kits Scope Determination).

The Scope Ruling further stated that, like the retractable awnings and the baluster kits, Rubbermaid's products are designed to function only when used in conjunction with other products

---

[1]Rubbermaid's mop frames and handles were entered into the United States as fully assembled merchandise, but the mopping kits were not. Rubbermaid therefore argued that the mop frames and handles were subject to the "finished merchandise" exclusion, and that the mopping kits were subject to the exclusion for "finished goods kits."

(here, mop heads) that are not included at the time of importation. *See* Scope Ruling at 9. The Scope Ruling therefore concluded that the Rubbermaid merchandise at issue did not constitute "finished merchandise" and thus did not satisfy the criteria for the "finished merchandise" exclusion. *Id*.

As to Rubbermaid's mopping kits, the Scope Ruling similarly stated that a complete mopping kit would require inclusion of a mop head. Scope Ruling at 9. Because the mopping kits lack the interchangeable, disposable mop heads at the time of importation, the Scope Ruling concluded that the mopping kits did not constitute "finished goods kits" and thus fell within the scope of the Orders. *Id*.

Rubbermaid prevailed on its Motion for Judgment on the Agency Record challenging the Scope Ruling, and this matter was remanded to Commerce for further consideration. *See generally* <u>Rubbermaid Commercial Products LLC v. United States</u>, 38 CIT ____, 2014 WL 4723733 (2014). Now pending are Commerce's Final Results of Redetermination Pursuant to Court Remand, and the parties' comments on those results. *See generally* Final Results of Redetermination Pursuant to Court Remand ("Remand Results"); Comments on Results of Redetermination ("Pl.'s Comments on Remand Results"); Defendant's Response to Plaintiff's Comments on the Remand Redetermination ("Def.'s Response to Pl.'s Comments on Remand Results").

In the Remand Results, Commerce "clarified [the agency's] interpretation of the exclusion[s] . . . for 'finished merchandise' and 'finished goods kits.'" Remand Results at 13. Based on those clarifications, the Remand Results concluded that all of the Rubbermaid merchandise falls within one or the other of the two exclusions and is therefore beyond the scope of the Antidumping and

Countervailing Duty Orders. *See id*. at 2, 14-15, 16-17, 24, 28; *see also id*. at 11-12 (summarizing Draft Remand Results).

For the reasons summarized below, the Remand Results must be sustained.

### Overview and Analysis

As to the mop frames and handles, Rubbermaid concluded, *inter alia*, that the Scope Ruling failed to adequately explain Commerce's determination that – because they are designed to function in conjunction with other products (not included at the time of importation) to form a complete cleaning device – the mop frames and handles did not fall within the "finished merchandise" exclusion. Rubbermaid, 38 CIT at ____, 2014 WL 4723733 * 9-10. In particular, Rubbermaid noted that the Scope Ruling did not address why the fact that the mop frames and handles must work in conjunction with other goods precluded the mop frames and handles from falling within the finished merchandise exclusion, when each of the exemplars of "finished merchandise" listed in the Orders – such as "finished windows with glass" and "doors with glass or vinyl" – also must work in conjunction with other goods in order to fulfill its intended function. *Id*., 38 CIT at ____, 2014 WL 4723733 * 9-10. Commerce was therefore directed on remand to reconsider its analysis of the finished merchandise exclusion and its application to products that are designed to work in conjunction with other goods. *Id*., 38 CIT at ____, 2014 WL 4723733 * 10. Commerce was also instructed to give further consideration to Rubbermaid's argument distinguishing "finished goods" (which are excluded from the Orders) from "intermediate goods" (which are within the scope of the Orders). *Id*., 38 CIT at ____, 2014 WL 4723733 * 10-11.

In addition, Rubbermaid directed Commerce to reconsider the line drawn by the agency

between merchandise that is permanently assembled and merchandise that is specifically designed to be adaptable, interchangeable, and replaceable/disposable, in light of the agency's Banner Stands Scope Ruling and its EZ Fabric Wall Systems Scope Ruling. Rubbermaid, 38 CIT at ____, 2014 WL 4723733 * 12-14 (discussing Final Scope Ruling on Banner Stands and Back Wall Kits (Oct. 19, 2011) ("Banner Stands Scope Ruling"); Final Scope Ruling on EZ Fabric Wall Systems (Nov. 9, 2011) ("EZ Fabric Wall Systems Scope Ruling")).

With respect to the mopping kits, Rubbermaid similarly ordered Commerce to reconsider its interpretation of the exclusion for "finished goods kits," taking the Banner Stands Scope Ruling and the EZ Fabric Wall Systems Scope Ruling into account. Rubbermaid, 38 CIT at ____, 2014 WL 4723733 * 15-17.

### A. The "Finished Merchandise" Exclusion

In analyzing whether Rubbermaid's mop frames and handles constitute "finished merchandise" for purposes of the "finished merchandise" exclusion, Commerce on remand focused first on the language defining the scope of the Orders which describes finished merchandise as "containing *aluminum extrusions as parts* . . . ." See Remand Results at 13 (quoting Antidumping Duty Order, 76 Fed. Reg. at 30,651 (emphasis added); Countervailing Duty Order, 76 Fed. Reg. at 30,654 (emphasis added)). The Remand Results interpreted the italicized language to mean that – to be excluded from the scope of the Orders as "finished merchandise" – a product must "contain aluminum extrusions 'as parts' plus an additional non-extruded aluminum component." Remand

Results at 13.[2]

---

[2]Throughout the Remand Results, Commerce placed great emphasis on this asserted requirement that merchandise must contain some component made of a material other than extruded aluminum in order to be covered by either the "finished merchandise" exclusion or the exclusion for "finished goods kits." *See, e.g.*, Remand Results at 11, 13, 14, 18, 19 (discussing "finished merchandise" exclusion); *id*. at 11, 15-16, 18 (discussing exclusion for "finished goods kits").

In the context of the finished merchandise exclusion, Commerce argued that, absent such a requirement, "this specific language [*i.e.*, the phrase "as parts"] would be read out of the [language defining the scope of the Orders], resulting in the phrase 'containing aluminum extrusions that are fully and permanently assembled and completed at the time of entry.'" Remand Results at 13. Commerce continued: "Thus, to give effect to this 'as parts' language, . . . to qualify for the finished merchandise exclusion[,] the product must contain aluminum extrusions as parts, and therefore must include some non-extruded aluminum component." *Id*. Commerce added that its interpretation "is supported by the illustrative examples of 'finished merchandise' contained in the [language describing the scope of the Orders], all of which contain extruded and non-extruded aluminum components (finished windows with glass, doors with glass or vinyl, etc.)." *Id*. Commerce further stated that "those products specifically included in the Orders, such as window frames and door frames, do not constitute finished merchandise because they cannot be considered to 'contain[] aluminum extrusions *as parts* that are fully and permanently assembled and completed at the time of entry.' Rather, the in-scope window frames and door frames are *the only parts* of the product." *Id*. at 13-14.

There is room for doubt as to the soundness of Commerce's reasoning on this point. *See generally*, *e.g.*, Meridian Products, LLC v. United States, 39 CIT ____, 2015 WL 3853684 (2015) (addressing claim that imported refrigerator/freezer trim kit – consisting of aluminum extrusions, as well as brackets, screws, hinge covers, a hexagonal wrench and installation kit, and a booklet of assembly instructions (all of which were made of materials other than aluminum extrusions) – is excluded from scope of Orders by exclusion for "finished goods kits"); Plasticoid Mfg. Inc. v. United States, 38 CIT ____, 28 F. Supp. 3d 1352 (2014) (addressing claim that "cutting and marking straight edge" used in drafting and cutting applications in industry and the arts, which consists of a single hollow aluminum extrusion, is excluded from scope of Orders by "finished merchandise" exclusion).

The gravamen of Commerce's position is that, because the finished merchandise exclusion refers to merchandise that "contain[s] aluminum extrusions as parts," merchandise can be covered by that exclusion only if the merchandise is made up of parts that are aluminum extrusions as well as parts that are not. But, at least at first blush, such a reading seems to be clearly at odds with the plain meaning of the word "parts." There is nothing in the definition of the word "parts" that inherently goes to the *material composition* of the "parts" (much less requires that "parts" must be made of at least two *different* materials). A product can be made entirely of plastic "parts."

―――――――――――――

To the extent that Commerce asserts that it is necessary for the agency to re-define the word "parts" in order to give effect to other text in the language describing the scope of the Orders, it is worth noting that any such problems are of Commerce's own making (since, as a practical matter, Commerce and petitioning domestic industries generally work in concert to define the scope of antidumping and countervailing duty orders). *See generally*, *e.g.*, Plasticoid, 38 CIT at ____ n.11, 28 F. Supp. 3d at 1364 n.11 (and authorities cited there) (highlighting interplay between Commerce and petitioners in defining scope of draft orders, and emphasizing that, "in exercising [Commerce's] authority to define or clarify [the] scope of [an] order[,] [the] agency must do so 'in a manner which reflects the intent of the petition'" (quoting Retractable Awnings Scope Ruling at 5 n.6)); *see also*, *e.g.*, Fedmet Resources Corp. v. United States, 755 F.3d 912, 921 (Fed. Cir. 2014) (emphasizing that "[a] petitioner has an obligation to be explicit and precise in its definition of the scope of the petition").

In addition, a fundamental tenet of interpretation is the principle of *contra proferentum* – that is, that any ambiguities are to be construed against the drafter (here, the petitioning domestic industry and Commerce). *See generally*, *e.g.*, Mesa Air Group, Inc. v. Dep't of Transportation, 87 F.3d 498, 506 (D.C. Cir. 1996) (discussing principle of *contra proferentum* in case involving interpretation of subsidy agreements between U.S. Department of Transportation and private air carriers); Restatement (Second) of Contracts § 206 (1981) ("Interpretation Against The Draftsman") (setting forth black letter rule that "[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds"). The Restatement (Second) of Contracts explains the basic policy rationale that undergirds the principle:

> Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party. He is also more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert. In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party.

Restatement (Second) of Contracts § 206, Comment *a*. To be sure, the Orders here are not contracts; but neither are they statutes (or even regulations). Particularly in light of the role of Commerce and domestic producers in drafting – and, specifically, in defining the scope of – antidumping and countervailing duty orders, the policy rationale for the principle of *contra proferentum* is illuminating.

Commerce's reliance on the interpretive canon *expressio unius est exclusio alterius* (*i.e.*, the expression of one is the exclusion of the others) and Commerce's reference to exemplars listed in the language defining the scope of the Orders would appear to add little or nothing to its case. *See*

Court No. 11-00463                                                                                               Page 9

Commerce next analyzed whether "a product that is 'fully and permanently assembled and completed at the time of entry' in its own right, but missing some other component to function as a final downstream product," is within the finished merchandise exclusion. *See* Remand Results at 14. The Remand Results took note of <u>Rubbermaid</u>'s observation that any interpretation of that exclusion must account for the fact that the language defining the scope of the Orders describes windows with glass and doors with glass or vinyl as "finished merchandise" even though such windows and doors could properly be characterized as "building parts" and "house parts." *Id*. (referring to <u>Rubbermaid</u>, 38 CIT at ____, 2014 WL 4723733 * 10).

Commerce therefore reconsidered its position that products could not fall within the exclusion for finished merchandise if "they are merely parts of a larger whole" and "function

---

*generally* <u>Meridian Products</u>, 39 CIT at ____ n.19, 2015 WL 3853684 * 6 n.19 (in context of exclusion for "finished goods kits," stating that "the [Orders'] listing of 'windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material' as excluded 'finished merchandise'[] does not imply that only goods that contain some non-aluminum part may qualify for the 'finished goods kit' exclusion"). Indeed, the *expressio unius* canon has been described as a "feeble helper in an administrative setting." *Id*., 39 CIT at ____ n.19, 2015 WL 3853684 * 6 n.19 (quoting <u>Adirondack Medical Center v. Sebelius</u>, 740 F.3d 692, 697 (D.C. Cir. 2014)).

The bottom line is that, even if other language in the Orders in fact is inconsistent with the plain meaning of "parts" (as Commerce claims it is), there is no apparent authority for Commerce to resolve that inconsistency by the expedient of re-defining the word "parts," any more than Commerce could re-define "black" to mean "white" or "day" to mean "night." If Commerce is not permitted to "interpret an *order* in a manner contrary to its terms" (*see*, *e.g.*, <u>Eckstrom Industries, Inc. v. United States</u>, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (emphasis added)), then surely Commerce is not permitted to interpret a *word* – *i.e.*, "parts" – to mean something other than its plain meaning.

Fortunately, there is no need to decide this question here. As Commerce acknowledges, each of the 13 Rubbermaid products at issue is made of both aluminum extrusions and other (non-extruded aluminum) materials. *See* Remand Results at 6 (stating that all Rubbermaid products at issue in this proceeding "contain aluminum extrusions as well as other non-aluminum components at the time of entry").

collaboratively with other components in order to form a completed product," and determined that such a position "may lead to absurd results." Remand Results at 14. Accordingly, Commerce articulated a "revised interpretation," such that "a product . . . that contains aluminum extrusions as parts along with additional non-aluminum components[] may meet the exclusion criteria for 'finished merchandise' provided that the good is 'fully and permanently assembled and completed at the time of entry,' regardless of whether it is later incorporated with other components, or assembled into a larger downstream product (*i.e.*, a subassembly)." *Id*.

Applying its new interpretation on remand to Rubbermaid's mop frames and handles, the Remand Results reasoned that, because each of the products in question is "comprised of extruded aluminum as well as non-extruded aluminum components," the products "meet the portion of the finished merchandise exclusion for goods 'containing *aluminum extrusions as parts*.'" Remand Results at 15.[3] The Remand Results further explained that, because the mop frames and handles "enter the United States ready to be attached to other components without any further assembly or modifications," they are (in the words of the exclusion) "fully and permanently assembled and completed at the time of entry." *Id*. And, on the basis of Commerce's new interpretation (outlined above), the Remand Results concluded that it was of no moment that the mop frames and handles "constitute parts of a larger system." *Id*. Commerce thus determined on remand that Rubbermaid's mop frames and handles constitute "finished merchandise" and are therefore excluded from the

---

[3]*See* n.2, *supra* (questioning Commerce's asserted requirement that, to fall within either of the two exclusions, merchandise must be made of both aluminum extrusions *and* some other material). Because Commerce repeats this asserted requirement throughout the Remand Results, the asserted requirement will necessarily be repeated in summarizing the agency's analysis here. The reservations expressed in note 2 above apply across the board, but will not be reiterated with respect to each of the Remand Results' numerous references to the asserted requirement.

scope of the Orders. *Id*. at 14-15.

The Remand Results' revised interpretation of the "finished merchandise" exclusion is vehemently opposed by the Aluminum Extrusions Fair Trade Committee, which represents the interests of domestic producers of aluminum extrusions. *See* Remand Results at 21-23 (summarizing Letter to Commerce from Counsel for Aluminum Extrusions Fair Trade Committee (Jan. 29, 2015) (comments filed on Commerce's Draft Remand Results)); *see also id*. at 9-11 (summarizing Letter to Commerce from Counsel for Aluminum Extrusions Fair Trade Committee (Nov. 14, 2014) (comments filed in advance of Commerce's Draft Remand Results)).[4] However, as Rubbermaid explained, although the Committee initially intervened as a defendant-intervenor in this action, it subsequently withdrew from the litigation. *See* Rubbermaid, 38 CIT at ____ n.2, 2014 WL 4723733 * 1 n.2. The Committee therefore was not entitled to file comments on the Remand Results in this forum, and did not seek to do so. For its part, predictably, Rubbermaid concurs in the Remand Results. *See* Pl.'s Comments on Remand Results at 2. The Government similarly states that the Remand Results should be sustained. *See* Def.'s Response to Pl.'s Comments on Remand Results at 2.

### B. The Exclusion for "Finished Goods Kits"

The Remand Results also analyzed whether Rubbermaid's mopping kits fall within the exclusion for "finished goods kits," even though (like the mop frames and handles discussed above)

---

[4]Although the Aluminum Extrusions Fair Trade Committee withdrew from this litigation, the Committee nevertheless sought, and was granted, Commerce's authorization to file comments with the agency in the course of the remand proceeding. *See* Memorandum to File from E. Greynolds, Program Manager, Office III, Operations, re: Deadline for Parties to File Comments in Advance of Draft Remand Results (Nov. 7, 2014). Rubbermaid did not object.

the mopping kits do not include the interchangeable, replaceable mop heads at the time of importation. *See generally* Remand Results at 15-17; *see also id*. at 11-12 (summarizing analysis of exclusion for "finished goods kits" in Draft Remand Results).

In the Remand Results, Commerce first looked to the language governing the scope of the Orders which states that "[a]n imported product will not be considered a 'finished goods kit' and therefore excluded from the scope . . . merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product." *See* Remand Results at 15 (quoting Antidumping Duty Order, 76 Fed. Reg. at 30,651; Countervailing Duty Order, 76 Fed. Reg. at 30,654). The Remand Results interpreted the quoted language to mean that – to be excluded from the scope of the Orders as a "finished goods kit" – a product must "contain aluminum extrusions plus an additional non-extruded aluminum component[] which goes beyond mere fasteners." Remand Results at 15-16.[5] Noting that Rubbermaid's mopping kits include "non-extruded aluminum components (such as a trigger handle and refillable reservoir)," the Remand Results concluded that the mopping kits "satisfy this aspect of the finished goods kit exclusion." *Id*. at 16.

Commerce next examined whether a product can fall within the exclusion for finished goods kits if the product "facially meets the finished goods kit exclusion ('a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, . . . and is assembled "as is" into a finished

---

[5]Commerce's position on this point cannot be reconciled with Meridian Products, which squarely holds that "there is nothing in the [Orders'] language [concerning the exclusion for finished goods kits] that indicates that the parts in an otherwise qualifying [finished goods] kit cannot consist entirely of aluminum extrusions." Meridian Products, 39 CIT at ____, 2015 WL 3853684 * 5; *see generally* n.2, *supra*.

product'), but is missing some other component to function as a final downstream product" – *i.e.*, the mop heads. Remand Results at 16. In its Scope Ruling, Commerce had concluded that Rubbermaid's mopping kits were not covered by the exclusion for finished goods kits because the mopping kits "lacked the integral components necessary" (*i.e.*, interchangeable, disposable mop heads) "to assemble full and complete finished goods kits." *Id*. (quoting Scope Ruling at 9).

On remand, Commerce revisited that rationale in light of its Banner Stands Scope Ruling and its EZ Fabric Wall Systems Scope Ruling. Although the merchandise in each of those two cases was missing a component (respectively, graphic material and fabric walls), Commerce concluded in both cases that the merchandise nevertheless was covered by the exclusion for finished goods kits, because the missing components were due to the merchandise's interchangeable design. *See* Remand Results at 16-17 (discussing Banner Stands Scope Ruling and EZ Fabric Wall Systems Scope Ruling). The Remand Results here analogized the "interchangeable" and "disposable" mop heads missing from Rubbermaid's mopping kits to the graphic material and the fabric walls that were missing from the merchandise at issue in the Banner Stands Scope Ruling and the EZ Fabric Wall Systems Scope Ruling, and concluded that – as in those cases – the mopping kits here are excluded from the Orders as finished goods kits. Remand Results at 17.

The Aluminum Extrusions Fair Trade Committee takes strong exception to Commerce's determination on remand that Rubbermaid's mopping kits constitute "finished goods kits" and are therefore beyond the scope of the Orders. *See generally* Remand Results at 21-23 (summarizing Committee's comments on Commerce's Draft Remand Results); *see also id*. at 9-11 (summarizing

Committee's comments filed in advance of Commerce's Draft Remand Results).[6] As explained above, however, the Committee withdrew from this litigation and thus has not sought to file comments on the Remand Results with the court. On the other hand, Rubbermaid has filed comments, and advises that it concurs in the Remand Results. *See* Pl.'s Comments on Remand Results at 2. The Government also urges that the Remand Results be sustained. *See* Def.'s Response to Pl.'s Comments on Remand Results at 2.

### C. Summary

As outlined herein, Commerce has determined on remand that all Rubbermaid merchandise at issue is excluded from the scope of the Antidumping and Countervailing Duty Orders, because Rubbermaid's mop frames and handles fall within the "finished merchandise" exclusion and its mopping kits are covered by the exclusion for "finished goods kits." Further, the Remand Results comply with the court's instructions in Rubbermaid, 38 CIT ____, 2014 WL 4723733, and are supported by both parties.

---

[6]As Commerce observed in the Remand Results, the comments that the Aluminum Extrusions Fair Trade Committee filed with the agency focused principally on the issue of subassemblies. *See* Remand Results at 27. In its analyses, the Committee generally did not distinguish between Rubbermaid's mop frames and handles (and the "finished merchandise" exclusion), on the one hand, and the company's mopping kits (and the exclusion for "finished goods kits") on the other. *But see, e.g.*, Letter to Commerce from Counsel for Aluminum Extrusions Fair Trade Committee at 4 (Jan. 29, 2015) (comments filed on Commerce's Draft Remand Results) (discussing exclusion of "kits that will be assembled to form a 'final finished good'").

Court No. 11-00463                                                                                                    Page 15

## **Conclusion**

For all the reasons set forth above, the Department of Commerce's Final Results of Redetermination Pursuant to Court Remand must be sustained.  Judgment will enter accordingly.

/s/ Delissa A. Ridgway<br>
Delissa A. Ridgway<br>
Judge

Decided:   July 22, 2015
             New York, New York